# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHANEL PROCTOR, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Case No. 1:18-cv-00701 (TNM) |

## MEMORANDUM OPINION

Plaintiffs Shanel Proctor and Charlaine Braxton, two homeless residents of the District of Columbia, are suing the District under 42 U.S.C. § 1983 and the Fourth Amendment. They seek an injunction ordering the District not to destroy the unattended personal belongings of homeless residents without first storing them for 60 days so they can be reclaimed. They seek to represent a proposed class consisting of all homeless persons who reside in public spaces that are subject to District, rather than federal, government oversight and have been or will be subject to encampment clearings by the District. Now before me are Plaintiffs' Motions for a Preliminary Injunction and for Class Certification. Because the Plaintiffs have not made the showing required to justify either a preliminary injunction or class certification, both of which are exceptional measures, the Plaintiffs' motions will be denied.

## I. BACKGROUND

The basic facts of this case are undisputed. The District of Columbia has adopted a Protocol for the Disposition of Property Found on Public Space and Outreach to Displaced Persons. Compl. Ex. 2. By following this Protocol, the District provides homeless individuals

an opportunity to prevent their property from being destroyed if they wish to keep it. *See, e.g.*, *id.* at Exs. 3, 4; Defs.' Opp. to Mot. Prelim. Inj. Ex. 1 (Horen Decl.) ¶¶ 10, 14, 22, 54-55, 61-63. That said, the Protocol does not specifically address the proper treatment of property that appears to be abandoned. *Id.* ¶¶ 52-53. As a result, the District destroyed Plaintiffs' personal property and the personal property of other homeless individuals upon finding it unattended—and, according to the District, apparently abandoned—in public spaces. Compl. Decls. of Charlaine Braxton (Braxton Decl.) and Shanel Proctor (Proctor Decl.); *id.* at Exs. 3-10.

### A. The District of Columbia's Protocol

The Protocol applies to property left in public spaces maintained by the District "when the property left in the public space presents a security, health, or safety risk, interferes with community use of public space, or becomes a significant community nuisance." Compl. Ex. 2, 3. The Protocol establishes a detailed procedure for standard disposition of this property, providing District employees a guide to follow before, during, and after cleanup of a public space where homeless individuals have an encampment. *Id.* at 4-7. In doing so, the Protocol has three main purposes. Horen Decl. ¶ 5. First, it seeks to address immediate and persistent public health and safety concerns, including concern about homeless people's exposure to the elements, the risk of fires caused by cooking and heating inside tents, the spread of disease caused by improper disposal of human waste and by vermin attracted to garbage and food waste, and the use of closed tents as sites for drug use and prostitution. *Id.* ¶¶ 5-6. Second, it seeks to "enroll residents in safer, healthier living arrangements through an array of housing, mental health, and other services." *Id.* ¶ 5. Third, it seeks to ensure that public spaces are clean and accessible to the public. *Id.*

Before cleaning an encampment, the Protocol directs District employees to post conspicuous signs throughout the immediate vicinity identifying the area to be cleaned, stating the date and time of the cleanup, warning that items left in the area at the time of the cleanup will be subject to removal and disposal, and providing the contact information of homeless support agencies. Compl. Ex. 2, 4. An initial notice is posted 14 days before cleanup, and a final notice is posted at least 48 hours before cleanup. *Id.* at 4-5. In addition to posting signs, the Protocol directs that "outreach workers will make every effort to share this information verbally with anyone at the site to ensure those who are unable to read or have difficulty comprehending the information are made aware of the impending cleanup action." *Id.* at 5. Outreach workers are also directed to offer relevant services to homeless individuals affected by a cleanup, including temporary shelter or permanent housing placements when these can be arranged. *Id.*

On the day of a scheduled cleanup, the Protocol directs Department of Human Services (DHS) employees to arrive an hour early "to confirm everyone who is interested in packing belongings has the opportunity to do so" and to provide encampment residents with containers or bags for storing their belongings, including two 40-gallon storage boxes or bins. *Id.* at 6. Residents may designate for storage whatever fits in the two boxes, with limited exceptions for items that pose public health or safety hazards. *Id.* And the Protocol directs DHS not to discard certain categories of items, including important documents, fully assembled and operational bicycles, and functional tents. *Id.* The Protocol also directs DHS to inventory all belongings that it takes into storage.

After an encampment cleanup, the Protocol gives homeless individuals 60 days to reclaim their property by calling DHS at a number provided on the notice signs. *Id.* at 6-7. The Protocol instructs DHS to store the property during this time, to make it available for pickup, and

to provide delivery options for individuals who are moving into permanent housing. *Id.* at 7. After 60 days, the Protocol permits DHS to discard any property that remains unclaimed. *Id.*

### B. The District of Columbia's Practice

The District of Columbia's actual conduct of encampment cleanups appears to be informed by the Protocol's orientation toward assisting homeless people while maintaining clean public spaces. The parties do not dispute that the District posts notice before conducting a cleanup, as the Protocol directs. There does appear to be some tension between the Protocol's instruction that the notice should include a warning that "any items not removed by the cleanup deadline are subject to removal and disposal" and the sign's actual warning that items not removed by the cleanup time "are subject to removal and disposal" *unless* the items are personal belongings packed in containers provided for storage or are personal belongings in plain sight of obvious value. *Compare id.* at 4 *with* Horen Decl. ¶ 12. But in addition to posting notice, outreach workers visit the site several times in the weeks before a cleanup to determine who lives there, to explain what will happen, and to explain that tents and other belongings may be preserved by moving them or by packing them for temporary storage by the District. Horen Decl. ¶ 14. Outreach workers have ready access to interpretive services if needed. *Id.* ¶ 18.

During a cleanup, District employees sort hazardous waste, items that can be put into a trash truck, and items in plain sight that should be stored, such as important documents, medication, glasses, bicycles, and electronics. *Id.* at 39-40. In some cases, District employees may open a purse, backpack, suitcase, or other container that appears likely to contain a wallet or identification. *Id.* at 40. Even so, the District will sometimes discard documents, functional tents, and other items that the Protocol says should not be discarded, if DHS staff determine that the property is clearly abandoned or at least can be considered abandoned. *See id.* ¶¶ 52-53

4

(describing designation and treatment of property deemed to be abandoned); *but see* Mot. Prelim. Inj., Decl. of Victor D. Ban (Ban Decl.) Ex. 8 (unattended tent was discarded but two unattended bags and some electronics were stored); *id.* Ex. 10 (abandoned tents were inspected for valuables, medication found among abandoned property was returned to its owner, and a Metro card found in an abandoned tent was stored); Supplemental Decl. of Victor D. Ban (Supplemental Decl.) Ex. 13 (abandoned tent was searched for personal documents and belongings); *id.* Ex. 28 (unattended medications were stored); *id.* Ex. 29 (unattended papers were stored).

Tents and other property are generally found to be abandoned on one of three grounds: (1) the property appears to be uncared for and has been deteriorating throughout the notice period, and outreach staff and other residents do not know who owns the property; (2) "despite two weeks of notice, opportunity, and outreach, including information from outreach or other residents that the owner knew about the upcoming cleanup, the owner chose not to be there or otherwise communicate to others his or her desire to have his or her belongings stored"; or (3) the owner leaves the cleanup site without the property after the cleanup team arrives. Horen Decl. ¶ 52; Ban Decl. Ex. 4 (a couple's items were discarded when they walked away from their property at the start of a cleanup); *cf. id.* Ex. 7 (a woman's tent and other property were discarded after she walked away from an encampment before a cleanup started).

In practice, the determination that property is abandoned appears to involve a fact-specific, individualized analysis. *See, e.g.*, Supplemental Decl. Ex. 16 (unattended property was discarded after "[i]t was observed that the resident had moved the belongings that he wanted and left a collection of items and trash"); *id.* Ex. 18 (unattended wheelchair that was discarded had dry-rotted wheels and unattended tent that was destroyed contained no valuables and smelled of

5

decayed food and human waste); *id.* Ex. 20 (unattended property that was discarded was so waterlogged it was almost impossible to move without a backhoe, the owner was personally notified of the cleanup the night before, and two new blankets were left on the site for the resident); *id.* Ex. 21 (unattended items that were discarded were wet and in many cases dripping from recent rains).

The District also considers extenuating circumstances in determining whether property is abandoned. Horen Decl. ¶ 53. For example, if the District learns that the property owner has been detained or hospitalized, the property is reviewed for storage rather than considered abandoned and discarded. *Id.* ¶ 50; *cf.* Supplemental Decl. Ex. 15 (the District tried to return an unattended identification card, walker, and glucometer to a woman they learned had been "admitted to a program"). If the District learns that the property owner lacks the mental capacity to understand, DHS considers alternatives to disposal of the property. Horen Decl. ¶ 51. The determination that property is or may be deemed to be abandoned is made in consultation with District outreach workers, third-party outreach providers, and encampment residents, who often know the individuals who own the property in question. *Id.* ¶¶ 46-49; *see also id.* ¶ 59 (unattended items discarded when District outreach workers were unable to make contact with owner and other encampment residents said they had not seen the owner in a while); Ban Decl. Ex 9 (unattended items discarded as abandoned after camper explained that "she told her neighbors about the clean up and they left their items there any way [sic]").

After a cleanup, the District logs and stores property for up to 60 days at the Adams Day Drop-In Center in Northeast Washington, D.C. Horen Decl. ¶ 29. The District provides free transportation for people to retrieve their property and makes reasonable arrangements to deliver property upon request. *Id.* That said, it is common for people to abandon their property,

6

sometimes because they have been provided new blankets and other items by the District or other outreach providers, sometimes because they have moved to a different part of town, and sometimes because they have resolved their situations, obtained housing, and begun moving on from homelessness. *Id.* ¶¶ 17, 30, 88.

After the District government destroyed property belonging to Ms. Proctor and Ms. Braxton, they brought this case. They allege that the District has a pattern and practice of summarily destroying the unattended property of homeless individuals that violates the Fourth Amendment and is actionable under 42 U.S.C. § 1983. Now before me are two motions filed by the Plaintiffs. One seeks a preliminary injunction ordering the District not to destroy the unattended personal belongings of homeless residents without first storing them for 60 days so they can be reclaimed, except if such property poses a public health or safety risk. Mot. Prelim. Inj., Proposed Order. The other seeks to have the Plaintiffs certified under Federal Rule of Civil Procedure 23(a) and 23(b)(2) as representatives of a class consisting of "all homeless persons who reside in public spaces that are subject to District, rather than federal, government oversight and have been or will be subject to encampment clears pursuant to the District of Columbia Protocol for the Disposition of Property Found on Public Space and Outreach to Displaced Persons." Mot. Class Certification, Proposed Order.[1] I held a hearing on the Motion for Preliminary Injunction on April 18, 2018.

---

[1] The District of Columbia notes that the Complaint originally suggested a class consisting of "All homeless persons who (i) reside at an abode or place of residence of one or more persons on public property or (ii) possess an accumulation of personal belongings that is present even when the individual may not be present at the location, where such public property or location is subject to District of Columbia, rather than federal, government oversight." Def.'s Opp. to Mot. Class Certification 1 (quoting Compl. ¶ 52). The District understands that Plaintiffs' Motion for Class Certification abandoned that class definition, and Plaintiffs have not objected. *Id.* (citing *Pigford v. Glickman*, 182 F.R.D. 341, 345 (D.D.C. 1998)).

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). This remedy should only be granted if the party that moves for a preliminary injunction makes "a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). That said, "[a] preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Still, an evidentiary hearing is required if the parties raise a genuine issue of material fact that must be resolved in deciding the motion. *Id.*[2]

Similarly, class certification is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Plaintiffs may only be certified to sue on behalf of a class if they can show:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, class certification under Federal Rule of Civil Procedure 23(b)(2) requires that the proposed class representatives show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

---

[2] Plaintiffs have not contested the factual assertions made by the District and they declined the Court's invitation to hold an evidentiary hearing. Tr. 65.

relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

## III. ANALYSIS

### A. The Plaintiffs Have Not Satisfied Their Burden to Show Entitlement to a Preliminary Injunction

The first point on which Plaintiffs must make a clear showing to obtain a preliminary injunction is that they have a likelihood of success on the merits. *League of Women Voters*, 838 F.3d at 6. At the heart of the Plaintiffs' merits argument is the assertion that summary destruction of unattended property violates the Fourth Amendment's guarantee of "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable . . . seizures." For constitutional purposes, a seizure of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992). "[T]he reasonableness of a seizure turns on the nature and extent of interference" with possessory interests. *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015). Needless to say, "[d]estroying property meaningfully interferes with an individual's possessory interest in that property." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001).

That said, "[a] warrantless . . . seizure of property that has been abandoned" is reasonable and consistent with the Fourth Amendment. *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989). To determine whether property has been abandoned for purposes of the Fourth Amendment, a court focuses on "the intent of the person who is alleged to have abandoned" the property, as inferred from "words spoken, acts done, and other objective facts." *Id.* at 846. This is an objective test, not a subjective one. *Id.* Under 42 U.S.C. § 1983, an individual may sue a

municipality for constitutional violations caused by a government "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Despite significant disputes in their briefing over the applicable caselaw, the parties appeared to agree at oral argument that individuals retain Fourth Amendment interests in unattended property, but relinquish all Fourth Amendment interests in abandoned property. Tr. 65-66.[3] This understanding of the law is consistent with the Ninth Circuit's determination in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), that the Fourth Amendment prohibits summary destruction of momentarily unattended property that is concededly not abandoned by the homeless individuals who own it. Thus, the question before me is whether the District has a practice of destroying only abandoned property, or of also destroying unattended property that has not been abandoned for Fourth Amendment purposes.

The Plaintiffs have not made a clear showing on this point. When asked to point to their most flagrant evidence of a Fourth Amendment violation, Plaintiffs' counsel highlighted the destruction of Ms. Proctor's property. Tr. 25. But it is far from clear that the destruction of either of the Plaintiffs' property was unconstitutional. Ms. Proctor's bedding, clothing, food, documents, and other items were destroyed during an encampment cleanup because outreach workers had not been able to contact her during any of their visits during the two-week notice period, other encampment residents did not know who owned the tent, and other encampment residents reported that they had not seen the owners "in a while." Proctor Decl. ¶ 5; Horen Decl. ¶ 59. Ms. Braxton's tent and other property appear to have been destroyed when Ms. Braxton walked away from it at the beginning of a cleanup, despite having more than two-weeks' notice

---

[3] If Plaintiffs still contend that the destruction of abandoned property could violate the Fourth Amendment, they have cited no authority for this proposition, which is contrary to the law of the Circuit as described above. *See* Pls.' Reply ISO Mot. Prelim. Inj., 5.

10

that the cleanup would take place. *See* Braxton Decl. ¶ 5; Horen Decl. ¶¶ 61-64; Ban Decl. Ex. 4; Tr. 25-28. The District of Columbia argues that these circumstances objectively showed the Plaintiffs' intention to abandon their property, making the destruction of their property reasonable for Fourth Amendment purposes. *See Thomas*, 864 F.2d at 845. On the record as it currently stands, I agree that the District could reasonably conclude Plaintiffs had abandoned their property.

Even if the destruction of Plaintiffs' property were unconstitutional, Plaintiffs have not shown that it took place under a custom of the District of Columbia that is actionable under Section 1983. Although the District has discarded unattended property on occasion, the record does not show that it has done so under circumstances that made an abandonment determination unreasonable. The record shows that homeless individuals often abandon property in public places when they acquire new property, move, or obtain housing. Horen Decl. ¶¶ 17, 30, 88. The District does have a policy and practice of cleaning up abandoned property. But as explained above, the District takes extensive precautions to reduce the risk of destroying property that is wanted. *See* Compl. Ex. 2 (District policy of providing notice, conducting outreach, providing containers to move or store property, and more); *see also* Horen Decl. ¶¶ 46-49 (District practice of making abandonment determinations in consultation with outreach providers and encampment residents).

Plaintiffs argue that it is unreasonable for the District to consider property abandoned solely because it is left unattended at a cleanup site given that the notice that the District posts inaccurately assures readers that some categories of property left at the site will be stored for 60 days and will be available to be reclaimed during that time. Reply ISO Mot. Prelim. Inj.; *see also* Horen Decl. ¶¶ 12, 53. Plaintiffs may be right. But it is unnecessary for me to decide this

11

question because the record contains no clear examples of the District deeming property abandoned based on the simple fact that notice was posted and the property was left unattended.[4] To the contrary, the record contains several examples of the District evaluating a combination of circumstances to determine whether property had been abandoned.[5] And Plaintiffs do not suggest that they were misled by the notices, or even read them. Even if the District has sometimes made unreasonable abandonment determinations, the Plaintiffs have not adequately showed either that their constitutional rights were violated or that any violations that occurred resulted from a District custom actionable under Section 1983.

Plaintiffs' heavy reliance on *Lavan* does not help their case. In *Lavan*, the City of Los Angeles posted only a general notice that cleanups could happen anywhere in the Skid Row

---

[4] This is not to say that the District has never considered property abandoned on inadequate grounds or in unreasonable reliance on a misleading notice. I note that the current record consists largely of terse and often cryptic cleanup reports, many of which do not state whether the District had indicators of abandonment beyond the simple fact that property was unattended. *See, e.g.*, Ban Decl. Ex. 3 (noting complaint that unattended belongings had been lost during cleanup without explaining whether there was an abandonment determination or the reasons for it); *id.* Ex. 5 (noting that unattended tent and belongings were discarded when the owner did not answer a phone call made during cleanup); *id.* Ex. 6 (noting that three tents were "discarded as being abandoned and owner un-identifiable" without conveying other factors that led to abandonment determination); *id.* Ex. 10 (stating that tents were abandoned without explaining the basis for this determination); Supplemental Decl. Ex. 13 (noting that unattended tent was discarded without explaining whether there was an abandonment determination or the reasons for it). In fact, the reports sometimes do not even state whether unattended property was destroyed or moved into storage. *See, e.g.*, Supplemental Decl. Exs. 14, 19, 22, 23, 25.

[5] *See, e.g.*, Ban Decl. Ex 9 (unattended items were discarded as abandoned after a camper explained that "she told her neighbors about the clean up and they left their items there any way [sic]"); Supplemental Decl. Ex. 16 (unattended property was discarded after "[i]t was observed that the resident had moved the belongings that he wanted and left of a collection of items and trash"); *id.* Ex. 20 (noting disposal of unattended property that was so waterlogged it was almost impossible to move without a backhoe, noting that the resident had personally been notified of the cleanup the night before, and noting that two new blankets were left on the site for the resident); *see also* Horen Decl. ¶¶ 46-49 (stating that the District consults with several sources in determining whether property is abandoned).

district on any weekday between 8:00 a.m and 11 a.m., leaving homeless residents of Skid Row unable to anticipate exactly when or where a cleanup would take place. *See Lavan*, 693 F.3d at 1034 (Callahan, J., dissenting). Los Angeles did not deny that it had "a policy and practice of seizing and destroying homeless persons' unabandoned possessions." *Id.* at 1025 (Wardlaw, J.). Los Angeles did not have a good-faith belief that the Plaintiffs' momentarily unattended property was abandoned: In fact, there were many times that City employees destroyed property after the owner returned and tried to reclaim it or after other people explained that the owner would be returning and had not abandoned the property. *Id.*

By contrast, the District of Columbia provides residents with notice of the specific date, time, and place of a scheduled cleanup, allowing them two weeks to move their possessions or pack them for storage. Horen Decl. ¶ 10. It takes extensive measures to identify the owners of the property in question and tries to help the owners not only by providing them containers to store or move their belongings but also by seeking to arrange housing and provide other services. *Id.* ¶¶ 13-15, 23. When District employees encounter unattended property, they consider many factors and consult several sources, including other encampment residents, to make what appears to be a good-faith determination about whether the property is abandoned. *Id.* ¶¶ 46-53, 59; Ban Decl. Ex 9. The District's practice is unquestionably much more narrowly tailored and respectful of the rights and property of its homeless residents than the practice at issue in *Lavan*. Unlike the plaintiffs in *Lavan*, Plaintiffs here have failed to establish a violation of their Fourth Amendment rights and have failed to establish an unconstitutional District custom actionable under Section 1983. For both these reasons, they have not made a clear showing of a likelihood of success on the merits.

The second point on which Plaintiffs must make a clear showing is that they would suffer irreparable harm without preliminary relief. *League of Women Voters*, 838 F.3d at 6. To make this showing, Plaintiffs must establish not only that the injury they would suffer absent a preliminary injunction is beyond remediation, but also that it is imminent and certain if preliminary relief is not provided. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The District of Columbia conceded at the hearing that the destruction of certain personal belongings is irremediable. Tr. 61. And the law of the Circuit states that "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. Of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

But the Plaintiffs have not established that such losses are imminent and certain without preliminary relief. As explained above, Plaintiffs have not made a clear showing that the District has a pattern of destroying property in violation of the Fourth Amendment. And if the District schedules another cleanup that affects Plaintiffs, Plaintiffs can protect their property by moving it or designating it for storage.[6] Thus, Plaintiffs have not made an adequate showing on the second prong of the test for evaluating a preliminary injunction motion. Although they have identified an irremediable harm, they have not shown that they would suffer this harm without preliminary relief.

The third and fourth points that the Plaintiffs must show are that the balance of the equities and the public interest favor injunctive relief. *League of Women Voters*, 838 F.3d at 6. The Plaintiffs argue only that one equitable and public interest factor points in their favor, and

---

[6] Plaintiffs note that the District of Columbia's Protocol has provisions for immediate disposition of property without notice under special circumstances. Reply ISO Mot. Prelim. Inj., 8-9. But Plaintiffs have provided no evidence that the District has ever used these procedures or made any showing that it is likely to do so in the future.

14

that is the importance of protecting constitutional rights. *See* Pls.' Memo. ISO Mot. Prelim. Inj., 9-10; Pls.' Reply ISO Mot. Prelim. Inj., 9. As has already been explained, it is not clear that denying a preliminary injunction would lead to the Plaintiffs suffering any deprivation of their constitutional rights. On the other hand, the District's cleanup efforts serve the important interests of public health and public safety, and the relief the Plaintiffs propose would impede these efforts. A court order directing the District to store all unattended property except property that poses a public health or safety risk would likely chill the exercise of discretion inherent in determining what items pose such risks and would also impose on the District the unnecessary and potentially significant cost of storing abandoned property. The balance of the equities and the public interest tip in favor of the District, like the other factors that I have considered above. The Plaintiffs are thus not entitled to a preliminary injunction.

### B. The Plaintiffs Have Not Satisfied Their Burden to Show That the Proposed Class Should Be Certified

Plaintiffs have not adequately established numerosity, the first prerequisite for class certification under Federal Rule of Civil Procedure 23.[7] To prove numerosity, a party must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Generally, courts have found that a proposed class consisting of at least forty members will satisfy the impracticability requirement." *Johnson v. Dist. of Columbia*, 248 F.R.D 46, 52 (D.D.C. 2008). Although Plaintiffs need not prove the exact class size with certainty, they concede that they must provide "a reasonable basis for the estimate provided." *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999). "Mere conjecture, without more, is insufficient to establish numerosity." *Pigford*, 182 F.R.D. at 347.

---

[7] Given this determination, it is unnecessary for me to consider whether Plaintiffs have satisfied the other class certification requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(2).

Plaintiffs propose to certify a class consisting of "all homeless persons who reside in public spaces that are subject to District, rather than federal, government oversight and have been or will be subject to encampment clears pursuant to the District of Columbia Protocol for the Disposition of Property Found on Public Space and Outreach to Displaced Persons." Pls.' Memo. ISO Mot. Class Certification 1. To establish numerosity, the Plaintiffs note Census data suggesting that about 897 residents of the District of Columbia are "unsheltered" and assert, "[t]hese hundreds of residents are subject to the Protocol." *Id.* at 3.

The District of Columbia responds that not all of the unsheltered residents of the District "have been or will be subject to encampment clears pursuant to" the Protocol, noting that Plaintiffs have pointed to far fewer than 40 situations in which individuals' unattended property has been discarded and observing that the same individuals may have been involved in several situations. Def.'s Opp. to Mot. Class Certification 5-6.[8] The idea that not all unsheltered residents of the District have been or will be subject to encampment cleanups is supported by the fact that the Protocol applies only "when the property left in the public space presents a security, health, or safety risk, interferes with community use of public space, or becomes a significant community nuisance" and "does not apply to any property that is left in the public space located on federal property, including National Park Service land, WMATA property, or private property." Compl. Ex. 2, 3. Much of the land in the District of Columbia is federal property, including significant amounts of parkland, which presumably are common encampment

---

[8] By the District's count, there were only 14 times unattended property was discarded. *Id.* at 5. By Plaintiffs' count, there were 24. Pls.' Consent Motion File Supplemental Affidavit ¶ 3. As noted above, the record is not always clear about whether unattended property was destroyed or stored.

locations.[9]  Much of the remaining land in the District is private property.  So it is hardly credible to assert that all the unsheltered residents of the District keep their possessions on public land maintained by the District.[10]  Nor am I willing to assume that all homeless people maintain property that presents public health or public safety risks, interferes with community use of public space, or is a significant community nuisance.

Rather than providing additional information to allow a reasonable approximation of the class size, the Plaintiffs reply to the District's argument by repeating that Census data shows there are 897 unsheltered people in the District of Columbia and asserting that "[t]hose 897 people are members of the proposed class; they reside in and maintain property on public spaces that are subject to District, rather than federal, authority."  Pls.' Reply ISO Class Certification.  But the Census data on which Plaintiffs rely provides no reasonable basis for this estimate of the class size.  The Plaintiffs therefore have failed to provide adequate grounds for class certification.

---

[9]  Around 25% of the land in the District of Columbia is administered by five federal agencies. Carol Hardy Vincent, et al., "Federal Land Ownership: Overview and Data," 7, Congressional Research Service (Mar. 3, 2017).

[10]  The Plaintiffs themselves note that the survey data on which they rely treats as "unsheltered" anyone "whose primary nighttime location is a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for people (for example, the streets, vehicles, or parks)."  Pls.' Reply ISO Mot. Class Certification 2 n.1.  This definition makes no distinction between federal, District, and private spaces, and it includes individuals who keep their property in vehicles, which appear unlikely to be subject to the Protocol.

## IV. CONCLUSION

For the reasons explained above, the Plaintiffs' Motions for Preliminary Injunction and for Class Certification will be denied. A separate order will issue.

Dated: May 2, 2018

*[signature]*
TREVOR N. MCFADDEN
United States District Judge