**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **SHANEL PROCTOR, *et al.*,** |
| Plaintiffs, |
| v. |
| **DISTRICT OF COLUMBIA**, |
| Defendant. |

Case No. 1:18-cv-701 (TNM)

**<u>MEMORANDUM OPINION</u>**

Three current and former homeless individuals challenge the District of Columbia's protocol for clearing encampments located throughout the City. They contend that the District destroys unabandoned but unattended belongings during these clearings in violation of the Fourth Amendment. Plaintiffs also raise a Fifth Amendment claim, arguing that the District does not provide adequate notice of clearings or the procedures. Their arguments' Achilles heel, however, is that the protocol has never injured them.

Both parties cross-move for summary judgment. On this record, none of the Plaintiffs can show that the injury they fear from the District's clearing policy—loss of wanted and unattended property—is impending. At least four events must occur before the Plaintiffs could possibly sustain any injury. So Plaintiffs lack standing to seek an injunction or declaratory relief against the District's current practices.

They also cannot recover from the District for prior clearings. Although all three Plaintiffs have experienced multiple District clearings, only one Plaintiff claims to have lost wanted property, once. But the undisputed record shows that the District complied with the Fourth Amendment for that clearing because it stored her belongings. The evidence also shows

that this Plaintiff had actual notice of the clearing before it took place, which satisfies the Fifth Amendment.  In any event, there is no custom, policy, or practice to justify holding the District liable for the claimed constitutional violations.  The Court will grant the District's motion for summary judgment.

## I.

## A.

In the District, homeless individuals often create "encampments":  temporary abodes or "accumulation[s] of personal belongings" that are located throughout the City.  *See* Third Am. Compl. ¶ 34, ECF No. 125 (cleaned up).

Unauthorized camping is illegal under D.C. regulations.  *See* 24 DCMR § 121.1.  But the District does not prosecute homeless people under this code.  It instead conducts "clearings" of the encampments to address the health and safety risks that they pose and to maintain clean public spaces.[1]  Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 30, ECF No. 126-1; Dep. Tr. of Joseph Melder 143:20–22, 147:16–19, ECF No. 99-3.[2]  Encampment clearings are necessary for the public, including the homeless, because encampments may include garbage "that attracts rodents and other vermin," "[h]uman waste and risk of the spread of disease," and [p]ublic health risks from rodent urine and droppings."  Decl. of Elizabeth

---

[1]  The District employs the term "cleanings," not "clearings."  *See* Def.'s Mem. of P. & A. in Supp. Opp'n to Pls.' Mot. Summ. J. & Cross-Mot. Summ. J. ("Def.'s Mem.") at 12 n.11, ECF No. 132-1 (describing disagreement with "clearing" term and noting that the "District does not use the word 'clearing' because that is not what happens here").  In deference to Plaintiffs' right to frame their complaint, the Court will use "clearing" throughout unless quoting the District.

[2]  All page citations, except for deposition transcripts, refer to the page numbers that the CM/ECF system generates.  Citations for deposition transcripts refer to the page number of the transcript.

Horen ("Horen Decl.") ¶ 6, ECF No. 18-1.  There also may be urine and needles found at these sites.  Pls.' Mot. Summ. J. ("Pls.' Mot.") Ex. 41 at 226, ECF No. 126-44.

In 2016, the District issued procedures for these clearings in the Protocol for the Disposition of Property Found on Public Space and Outreach to Displaced Persons ("2016 Protocol").  Pls.' SUMF ¶¶ 1–2; *see also* Pls.' Mot. Ex. 2, ECF No. 126-5.  It amended the 2016 Protocol three years later to reflect its clearing practices ("2019 Protocol").  Pls.' SUMF ¶¶ 14–15; *see also* Pls.' Mot. Ex. 1, ECF No. 126-4.  The 2019 Protocol remains in effect.  Pls.' SUMF ¶ 14.

The 2019 Protocol applies to property left on District public space that "presents a security, health, or safety risk, interferes with community use of public space, or becomes a significant community nuisance."  Pls.' Mot. Ex. 1 at 4–5.  Under the 2019 Protocol, "[a]ny property left on the cleanup site is subject to removal and immediate disposal."  *Id.* at 8.

The District conducts two types of clearings:  standard and immediate dispositions.  Pls.' SUMF ¶ 17.  Relevant here are the procedures for a standard disposition.[3]

Two weeks before a standard disposition, the District must "post notices/signs conspicuously throughout the immediate vicinity of the public space to cleaned."  Pls.' Mot. Ex. 1 at 6.  The notice must include the "designated area to be cleaned" and the "specific date and time by which persons must remove their property from the site before cleanup begins."  *Id.* The notice also advises (i) that "property left on site during the cleanup may be immediately destroyed," (ii) that "free storage of eligible property may be arranged in advance of the

---

[3] An "immediate disposition" can only occur if "property alongside a bridge, tunnel, or other public space must be disposed of immediately due to an emergency, security risk, health risk, or safety risk."  Pls.' Mot. Ex. 1 at 10.  It does not require the same notice procedures as a standard disposition.  *See* Pls.' SUMF ¶¶ 17, 26.  Immediate dispositions are not challenged in this case. *See* Pls.' Mot. at 28 n.7.

cleanup," and (iii) that "some unattended, non-hazardous property may be stored, in the District's discretion, and information about how to retrieve any property taken to storage after cleanup." *Id.* If the clearing is rescheduled, the notice must be updated at least 48 hours before the new clearing date. *Id.*

District outreach workers "make every effort to share this information verbally with anyone at the site and with community partners to ensure those who are unable to read or have difficulty comprehending the information are made aware of the impending cleanup action." *Id.* They also "make clear to individuals experiencing homelessness that the only way to be sure property is not disposed of during a cleanup is to move the property from the cleanup site before the specified cleanup time." *Id.* at 7.

The District allows individuals to store "eligible property" for free before a clearing. *Id.* at 8. This category of property includes "functional, empty, and disassembled tent[s]" and "non-commercial, functional bicycle[s] or other form[s] of motorized transport." *Id.* at 8. Unsafe items ineligible for storage include illegal items, property infested or potentially infested with bugs, wet or soiled items, and uncapped or exposed medical syringes. *Id.* at 8–9.

District personnel arrive at least 30 minutes before a clearing to offer occupants storage containers for eligible property. *Id.* at 9. During a clearing, District personnel must "make reasonable efforts to collect and store" eligible items that are "in plain sight, even if they are unattended at the time of the cleanup." *Id.* This includes: certain forms of personal identification, like drivers' licenses; photographs; financial, legal, or medical documents; medications; and "[o]ther property that is safe to store and of apparent value." *Id.* District personnel need not, however, "sort through piles or collections of belongings, including items

inside tents or containers, to identify" eligible property for storage "[d]ue to safety and other concerns." *Id.*

**B.**

Plaintiffs Charlaine Braxton, Rachelle Adams, and Jane Doe are current and former homeless women in the District who have experienced clearings.[4]   Third Am. Compl. ¶¶ 16–18.

Braxton currently resides in temporary housing after living in a homeless encampment. Pls.' SUMF ¶ 38; Def.'s Resp. to Pls.' SUMF & Statement of Undisputed Material Facts ("Def.'s SUMF") ¶¶ 48–49, ECF No. 132-4.   While homeless, Braxton experienced multiple encampment clearings and moved her belongings each time, except once in May 2017.   Def.'s SUMF ¶ 57.   She "usually" saw a sign about a clearing every month, prompting her to "note the cleanup date and make sure that [she] had [her] stuff moved."   Ex. 16, Dep. Tr. of Charlaine Braxton ("Ex. 16 Braxton Dep. Tr.") 98:5–18, ECF No. 99-17.   Braxton explained that homeless individuals moved their belongings when the District posted signs because the "city workers taught us . . . they came and taught us how to move the things."   *Id.* 99:9–13.

One day in May 2017, Braxton learned from D.C. personnel that she should move her property because a clearing would take place the next day.   Def.'s SUMF ¶ 63.   Braxton told them that she was too ill to move her belongings but still wanted them.   *Id.* ¶ 64.   They informed her that all her belongings, except food items, would be "be taken to [Adams] Place."[5]   *Id.* ¶ 65 (cleaned up).   Braxton left the site before the clearing and her items were gone when she returned.   *Id.* ¶¶ 66–67.   She called someone at Adams Place, who told her "that they had all of

---

[4]  Other plaintiffs were dismissed, either voluntarily or for failure to prosecute.   *See* Order (Nov. 18, 2019), ECF No. 84; Order (Dec. 16, 2019), ECF No. 90.

[5]  Adams Place is a day center "where the District provides services to people experiencing homelessness."   Def.'s SUMF ¶ 14 n.5.

[her] things, even the food" after Braxton listed her belongings.[6]  *Id.* ¶ 68 (cleaned up).  When Braxton went to Adams Place several weeks later, she found only some of her items.  *Id.* ¶¶ 69–70.

Doe currently occupies an encampment and has done so periodically since 2016.  Pls.' SUMF ¶ 39; Def.'s SUMF ¶¶ 72, 74.  She has experienced at least 15 clearings.  Pls.' SUMF ¶ 40.  Doe understands that "nothing should be on site" when workers arrive to clean, and she agreed that notice signs are changed to reflect the clearing times.  Pls.' Reply in Supp. Mot. Summ. J. & Opp'n to Def.'s Cross-Mot. Summ. J. ("Pls.' Reply") Ex. 3, Dep. Tr. of Jane Doe ("Doe Dep. Tr.") 39:21–40:1, 168:19–169:3, ECF No. 136-6.  Doe "would break down camp and move everything the day before" a clearing.  *Id.* 43:2–12; *see also id.* 43:22–44:8 (agreeing that it is "fair to say" that she moves her items the night before a clearing because she "[d]idn't want to lose anything").  She claims to be "pretty consistent" in leaving an encampment site the morning of a clearing and taking her items with her.  *Id.* 132:18–22, 134.

During the first clearing she experienced, Doe "gave up [] winter stuff and just let it go." *Id.* 43:16–17.  She notified no one that she wanted to retain these items, and she knew prior to leaving the encampment that the boxes could be disposed of because "[e]verybody around told us."  *Id.* 45:8–46:9.

Adams has periodically lived on the streets, occupying the same encampment since 2019.  Pls.' SUMF ¶ 35; Def.'s SUMF ¶¶ 31–32.  She has experienced at least 20 clearings, which continue every two weeks.  Pls.' SUMF ¶ 36.  Adams remains at her tent 90% of the time and otherwise is usually within a block radius.  Def.'s SUMF ¶ 37 n.7.  When absent, Adams

---

[6]  It is undisputed that the worker relayed this information to Braxton.  Pls.' Resp. to Def.'s SUMF ¶ 68, ECF No. 136-1.  Plaintiffs dispute, however, whether the worker actually had Braxton's belongings "and/or retain[ed] them in accordance with the Protocol."  *Id.*

tries "not to leave anything valuable in [her tent]." *Id.* (cleaned up); Ex. 15, Dep. Tr. of

Rachelle Adams ("Ex. 15 Adams Dep. Tr.") 71:1–72:1, ECF No. 99-16.

Adams states that the District "normally" conducts a clearing "two weeks from th[e] day

that they put the sign up." Ex. 15 Adams Dep. Tr. 57:14–58:6.  And she "[k]eep[s] track of the

dates of when they're doing clean-ups." *Id.* 60:10–22; *see also id.* 116:11 ("I always pack up

my tent.").  Adams stated that "[e]verything has to be moved from the location at 10:00 a.m."

for clearings, Def.'s SUMF ¶ 42 (cleaned up), and that she has moved her items the day before a

clearing "[b]ecause [she doesn't] feel like doing it early the next morning," Ex. 15 Adams Dep.

Tr. 154:6–15; *id.* 154:16–20 (testifying that it is possible to move items the day before "[i]f you

want to").  She has not lost property under the challenged practices here.  *See* Sealed Dep. Tr. of

Rachelle Adams ("Sealed Adams Dep. Tr.") 58–59, ECF No. 138-2 (discussing property loss

only in 2014 or 2015).

## C.

Three years ago, Braxton and another plaintiff sued claiming that the District destroys

unattended, wanted property during encampment clearings in violation of the Fourth

Amendment.  *See* Class Compl. for Inj. & Decl. Relief ¶¶ 60–64, ECF No. 1.

They sought a preliminary injunction, which the Court denied.  *See Proctor v. District of*

*Columbia*, 310 F. Supp. 3d 107 (D.D.C. 2018) ("*Proctor I*").  The Court found that there was no

"clear showing" that the District had a practice of "destroying unattended property that has not

been abandoned" or that any destruction of property was unconstitutional.  *Id.* at 114.  The

record also did not show that any property destruction "took place under a custom of the District

of Columbia that is actionable under Section 1983."  *Id.* at 115.  The Court noted evidence that

"homeless individuals often abandon property" and that the "District takes extensive precautions to reduce the risk of destroying property that is wanted." *Id.*

The Court also found that any alleged property losses were not "imminent and certain without preliminary relief." *Id.* at 116. The Court reasoned that "if the District schedules another cleanup that affects Plaintiffs, Plaintiffs can protect their property by moving it or designating it for storage." *Id.* at 117. Requiring the District to "store all unattended property except property that poses a public health or safety risk would likely chill the exercise of discretion inherent in determining what items pose such risks and would also impose on the District the unnecessary and potentially significant cost of storing abandoned property."[7] *Id.*

Braxton and the other plaintiff amended their complaint to add a claim under the Fifth Amendment's Due Process Clause. *See* Am. Compl. ¶¶ 118–31, ECF No. 32. They alleged that the District deprived homeless individuals of "adequate pre-clearing notice of the risk that clearings could result in the summary destruction of their belongings." *Id.* ¶ 121.

The District moved to dismiss. *See* Mot. to Dismiss, ECF No. 39. The Court "largely den[ied]" the motion "[g]iven the relaxed standard of review at this stage and the fact-bound nature of the claims at issue." *See Proctor v. District of Columbia*, No. 18-cv-00701 (TNM), 2018 WL 6181739, at *1 (D.D.C. Nov. 27, 2018) ("*Proctor II*"). The Court also found that Plaintiffs had standing because they "alleged enough facts to establish at the dismissal stage that they are in immediate danger of another allegedly unconstitutional clearing." *Id.* at *2.

Plaintiffs again amended their complaint—this time, to add (as relevant here) Plaintiffs Adams and Doe. *See* Second Am. Compl., ECF No. 57. The District moved to dismiss for lack

---

[7] The Court also denied class certification because Plaintiffs provided no reasonable basis to estimate their class size. *See id.* at 118.

of standing.  *See* Partial Mot. to Dismiss, ECF No. 60.  The Court found that it "need not resolve this issue now" because it "must review Plaintiffs' standing again—on summary judgment."  Order at 3 (Aug. 29, 2019), ECF No. 70.  The Court noted that "Plaintiffs' burden to establish standing will be heavier then" and that the "District will be free to re-raise its standing concerns at that time."  *Id.*

The District then published the 2019 Protocol.  So Plaintiffs sought leave to amend their complaint a third time.  *See* Mot. for Leave to File Third Am. Compl, ECF No. 103.  The Court granted leave during a motion hearing.  *See* Min. Entry (Aug. 21, 2020).

The Third Amended Complaint raises the same as-applied constitutional challenges to the District's clearing practices under 42 U.S.C. § 1983 (Counts I and II).  Third Am. Compl. ¶¶ 121–36.  Plaintiffs allege that the District "has implemented a policy, practice, or custom of systematically destroying unattended personal belongings of homeless individuals in the absence of any imminent public safety or health risk" in violation of the Fourth Amendment. *Id.* ¶ 123.  Under the Fifth Amendment, they claim that the District "deprives homeless individuals of adequate pre-clearing notice of the risk that clearings could result in the summary destruction of their belongings" and that homeless individuals "are not otherwise given a meaningful opportunity to protect or claim their belongings following any initial deprivation and prior to their immediate, final destruction."  *Id.* ¶¶ 131–32.

For the first time, Plaintiffs also assert a facial challenge (Count III).  *Id.* ¶¶ 137–45. They claim that the 2019 Protocol memorializes the District's unconstitutional practices so, as written, it violates the Fourth and Fifth Amendments.  *Id.* ¶¶ 138–40.

Plaintiffs ask for declaratory relief and an injunction preventing the District from enforcing the 2019 Protocol. *Id.* at 27–28. Braxton also seeks relief for her alleged property loss from the May 2017 clearing.[8] *See id.*; Def.'s SUMF ¶¶ 47, 83.

The parties cross-move for summary judgment. Plaintiffs move for summary judgment on their facial challenge to the 2019 Protocol under Count III, and the District moves for summary judgment on all three counts. Plaintiffs also re-raise their class certification motion. *See* Pls.' Renewed Mot. for Class Certification, ECF No. 105. The motions are ripe for disposition.[9]

## II.

To prevail at summary judgment, a party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it could alter the outcome of the suit under the substantive governing law, and "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

---

[8] The Court commends Plaintiffs' attorneys for their zealous advocacy on behalf of their clients throughout this litigation. They have offered a voice to those who are not always able to raise their own.

[9] The Court has jurisdiction under 28 U.S.C. § 1331, the federal question statute. The Court benefited from oral arguments at the preliminary injunction stage and finds that no additional argument is necessary now. It therefore denies Plaintiffs' request for another motion hearing. *See* LCvR 7(f).

317, 323 (1986).  Once this showing is made, the non-moving party bears the burden to identify "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (cleaned up).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In construing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255. The non-movant's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e).

### III.

Plaintiffs raise facial and as-applied claims to the District's clearing practices.  Plaintiffs together argue that the 2019 Protocol, as written, violates the Fourth and Fifth Amendments. Pls.' Mot. at 16–30.  Separately, Braxton argues that the District's actions violated her rights under those same constitutional provisions.  Pls.' Reply at 21–37.

The Court finds (A) that Plaintiffs lack standing to raise their facial challenge to the 2019 Protocol and (B) that Braxton's as-applied challenge to the District's clearing practices cannot survive summary judgment.

### A.

The District first contends that Plaintiffs lack standing to seek an injunction or declaration challenging the 2019 Protocol.  *See* Def.'s Mem. at 27–33.  The Court agrees.

11

The Constitution limits federal courts' jurisdiction to deciding "cases" and "controversies." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007). "[O]ne of the controlling elements in the definition of a case or controversy under Article III is standing." *Id.* (cleaned up). "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). These elements are the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The burden to establish standing rests with Plaintiffs. *Clapper*, 568 U.S. at 411–12.

Plaintiffs alleged enough facts to show standing at the dismissal stage. *See Proctor II*, 2018 WL 6181739, at *2. But that decision does not control here. It "does not obviate the court's responsibility to ensure that the [P]laintiff[s] can actually prove those allegations when one or both parties seek summary judgment." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016).

Plaintiffs' burden to establish standing "grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015). At summary judgment, Plaintiffs "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper*, 568 U.S. at 412 (cleaned up); *see also Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 n.3 (D.D.C. 2019) (finding earlier determination that plaintiff "had proffered sufficient standing to overcome dismissal . . . not dispositive" at summary judgment). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the

manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Plaintiffs' claims raise two standing issues that the Court must resolve: (1) whether Plaintiffs have shown that they have standing to pursue their facial challenge to the 2019 Protocol; and (2) whether Braxton has standing to challenge the District's clearing practices as applied to her.

### 1.

The District contends that Plaintiffs cannot establish the first element of standing:  injury in fact.  An injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up).

The inquiry here hinges on whether Plaintiffs have shown their injury is "actual or imminent."  Plaintiffs face an uphill battle to show injury from the 2019 Protocol because relief that "aim[s] to prevent future illegal acts often will implicate standing concerns." *City of Houston v. HUD*, 24 F.3d 1421, 1429 n.6 (D.C. Cir. 1994).  It is thus a "significantly more rigorous burden to establish standing" for the prospective declaratory and injunctive relief they request here. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (cleaned up).  Plaintiffs "must show that there is a substantial . . . probability of injury." *Id.* (cleaned up). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409 (cleaned up) (emphasis in original).

Plaintiffs contend (a) that the injury they fear under the 2019 Protocol is imminent; and (b) that, alternatively, they can rely on a procedural right to assert standing.  The Court rejects both.

**a.**

Plaintiffs "fear that [the District's] homeless encampment clearing practices will result in the destruction of their property" because they "cannot be with [their] belongings at all times."  Third Am. Compl. ¶¶ 100–01; Adams Discovery Resps. at 3, ECF No. 114-3; Doe Discovery Resps. at 3, ECF No. 114-4; Pls.' Reply Ex. 22, Decl. of Charlaine Braxton ("Braxton Decl.") ¶ 25, ECF No. 136-25 ("I am fearful that if I were to experience homelessness again, the District would take and destroy my unattended belongings again.").  So Plaintiffs claim that they face a "realistic threat of property loss" because the 2019 Protocol authorizes the "immediate destruction of any and all unattended, non-hazardous belongings during an encampment clearing."  Pls.' Mot. at 32 (cleaned up).

The Supreme Court rejected a similar theory in *Clapper*.  There, plaintiffs sought declaratory and injunctive relief because a statute "authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States" was unconstitutional.  *Clapper*, 568 U.S. at 401.  Plaintiffs claimed standing because their work would involve communications "with individuals who they believe are likely targets of surveillance under [the statute]."  *Id.*  Under their standing theory, there was an "objectively reasonable likelihood that their communications will be acquired under [the statute] at some point in the future."  *Id.*

The Supreme Court disagreed.  The Court held that this "theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly

14

impending.'" *Id.* (emphasis in original). It reasoned that plaintiffs' asserted Article III injury rested on a "highly speculative fear" that, among other things, the government would seek and receive approval under the challenged statute to target "the communications of non-U.S. persons with whom they communicate" and that plaintiffs would also be parties to those targeted communications. *Id.* at 410. This "highly attenuated chain of possibilities" did not constitute a "certainly impending" injury to satisfy Article III standing. *Id.* The Court also found the allegations "necessarily conjectural" because the statute "at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear." *Id.* at 412 (emphasis in original).

Similarly, in *Cruz v. American Airlines, Inc.*, travellers challenged an American Airlines policy to not settle lost-baggage claims if the claimant submitted a form more than 30 days after the loss. 356 F.3d 320, 322 (D.C. Cir. 2004). Plaintiffs sought "an injunction forbidding American from enforcing its 30-day rule and a declaration that this rule is unlawful" after American refused to reimburse their untimely claims under the policy. *Id.* at 328. The D.C. Circuit held that they lacked Article III standing. It determined that the "likelihood that American would, once again, lose plaintiffs' luggage [was] minuscule." *Id.* And the "likelihood that [plaintiffs] would again file their claims late is small, given their previous experience." *Id.* Finally, the Circuit held it "unlikely that American would again reject any late-filed claim, given the litigation its 30-day rule spawned and given that it has disavowed the 30-day rule." *Id.* Plaintiffs' "speculative interest in prospectively challenging the 30-day rule" was not enough to establish standing. *Id.* at 329.

*Clapper* and *Cruz* sink Plaintiffs' standing theory here. Take Adams and Doe first, who remain homeless. *See* Def.'s SUMF ¶¶ 32, 74; Pls.' SUMF ¶¶ 35, 39. The District does

"intend[] to continue conducting encampment clearings" under the 2019 Protocol, with "multiple encampment clearings" each week.  Pls.' SUMF ¶¶ 13, 41.  But consider all that must happen before Adams or Doe come even close to sustaining the loss of wanted but unattended property that they fear under the 2019 Protocol as written.[10]

*First*, Doe and Adams must remain in an encampment subject to periodic clearing.  Of all the preconditions here, this much *is* likely based on their testimony.  But that is not enough to show that a loss of property is imminent.  *Second*, they must miss or disregard the "notices/signs" that would have been posted "conspicuously throughout the immediate vicinity of the public space to be cleaned" for 14 days prior to the clearing.[11]  Pls.' Mot. Ex. 1 at 6.  This is unlikely, as both Doe and Adams admitted to regularly seeing these signs.  Doe Dep. Tr. 39:21–40:1; Ex. 15 Adams Dep. Tr. 57:14–58:6.  *Third*, they must be unable to move their belongings at *any* time in the 14 days before the clearing.  This is even less likely, as both Plaintiffs indicate that they habitually pack up before the clearing date.  Doe Dep. Tr. 43:2–12, 43:22–44:8; Ex. 15 Adams Dep. Tr. 154:6–15; *id.* 154:16–20.  *Fourth* and finally, they must be absent the 30 minutes before and during the scheduled clearing time to store their property.[12] *See* Pls.' Mot. Ex. 1 at 8 ("The District makes available free store of property that is eligible to

---

[10]  Since Plaintiffs' challenge to the 2019 Protocol is a facial one, the Court assumes for standing purposes that the 2019 Protocol would be implemented as written.  *Cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

[11]  The District offers to arrange storage and transportation before clearing under the 2019 Protocol.  Pls.' Mot. Ex. 1 at 8.  Although there is also a 48-hour trigger for rescheduled clearings, *id.* at 6, this would apparently be on top of the 14-day standard notice.

[12]  The 2019 Protocol requires District personnel to "arrive at the site at least <u>one half hour in advance</u> of the posted cleanup time to confirm everyone who is interested in packing belongings on site has the opportunity to do so."  Pls.' Mot. Ex. 1 at 9 (emphasis in original).

be stored . . . for up to 60 days at a site designated by the District to any individual with

property at the cleanup site who lacks permanent shelter.").  Only if *all* these unlikely events

occur will Plaintiffs then confront the possibility that District workers fail to follow their

obligation under the 2019 Protocol to "make reasonable efforts to collect and store" valuables

"in plain sight, even if they are unattended at the time of the cleanup."  *Id.* at 9; *see also Cruz*,

356 F.3d at 328–29 (outlining all the events that must happen before the plaintiffs experienced a

risk of injury to their "speculative interest").

That is speculation atop speculation.  Doe and Adams confront "precisely the kind of

'highly attenuated chain of possibilities' that is insufficient to establish standing."  *de Ramirez

v. Barr*, No. 18-cv-1516 (PLF), 2019 WL 4750373, at *3 (D.D.C. Sept. 30, 2019) (finding no

standing for challenge of immigration policy because plaintiff's standing theory "depend[ed] on

an injury that she can only anticipate").  The 2019 Protocol "at most *authorizes*—but does not

*mandate* or *direct*"—the destruction of unabandoned but unattended property that Plaintiffs

fear.  *Clapper*, 568 U.S. at 412 (emphasis in original).  As in *Clapper* then, the alleged injury is

too attenuated to satisfy Article III.

Braxton's feared injury is even more notional.  She is not now homeless but instead lives

in subsidized housing.  Pls.' SUMF ¶ 38; Def.'s SUMF ¶¶ 49, 86.  Braxton, though, argues that

the "temporary housing is entirely dependent on her ability to pay rent."  Pls.' Mot. at 31.  And

her ability to pay rent rests on continued employment, which is tenuous during the COVID-19

pandemic.  *Id.*; *see also* Pls.' SUMF ¶ 38 ("Especially in light of the uncertainty caused by the

COVID-19 pandemic, Ms. Braxton is in danger of having to return to the streets."); *but see*

Def.'s SUMF ¶ 86 (undisputed that Braxton "makes rent payments based on a sliding scale"

relating to her ability to pay).  So, unlike Adams and Doe, two more events must happen before

Braxton is even at risk of losing property in an encampment clearing: she must lose her job and be unable to find another to keep making flexible rent payments. So at least six events (the two just mentioned and the chain of events described above) must take place before Braxton faces a realistic threat of her feared injury. The Court declines to stretch Article III standing this far. *See Clapper*, 568 U.S. at 409 ("[T]hreatened injury must be *certainly impending* to constitute injury in fact." (emphasis in original) (cleaned up)).

Plaintiffs suggest that the risk of their feared injury is higher because they "cannot always be present at the time of a scheduled clearing because they might need to step away from their tents to obtain food, seek medical attention, [or] use or access other services." Pls.' SUMF ¶ 37; *see also* Pls.' Reply at 17. But even assuming this is true, it would make property loss only slightly more imminent. For Adams and Doe, three of the four events described above would still have to occur before they are even close to being at risk of losing their property— they must remain in an encampment, miss or disregard the notices 14 days before, and not move their belongings at *any* time in that period. And as to Braxton, she must lose her job, become unable to keep paying rent, and become homeless, after which the same chain of possibilities for Adams and Doe must still happen.

Plaintiffs' own experiences with clearings show that not being present the morning of a clearing does not necessarily lead to property loss. Recall that the 2019 Protocol requires written notice at least 14 days before a clearing (or 48 hours before a rescheduled clearing). Pls.' Mot. Ex. 1 at 6. So Plaintiffs can move their belongings *any* time before then, not just the morning of the clearing. Indeed, Adams and Doe—the only two currently homeless Plaintiffs— do just that. They have moved their belongings the day before the scheduled clearing. Adams testified that she has moved her items before "[b]ecause [she does not] feel like doing it early

the next morning."  Ex. 15 Adams Dep. Tr. 154:6–15; *id.* 154:16–20 (testifying that it is possible to move items the day before "[i]f you want to").[13]  And Doe has a process to "break down camp and move everything the day before" a clearing.  Doe Dep. Tr. 43:2–12; *see also id.* 43:22–44:8 (agreeing that it is "fair to say" that she moves her items the night before a clearing because she does not "want to lose anything").  She is "pretty consistent" in leaving encampments the morning of a clearing and taking her items with her.  *Id.* 132:18–22.

It is thus unsurprising that neither Doe nor Adams has lost unattended property under the District's challenged clearing practices.  *Cf. Biggerstaff v. FCC*, 511 F.3d 178, 183 (D.C. Cir. 2007) ("[A] prediction of injury based on experience suffices to show injury in fact to the extent that past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." (cleaned up)).  Adams claims that she lost property around 2015.  *See* Sealed Adams Dep. Tr. 58–59.  But she does rely on that property loss to challenge the District's clearing practices here.  Indeed, her purported loss happened before the District implemented the 2016 Protocol, which preceded the 2019 Protocol at issue.  *See Cruz*, 356 F.3d at 328 ("[A] prospective injunction against *future* applications of the 30-day rule will do nothing to remedy that past harm.").

Doe "gave up [] winter stuff and just let it go" during the first clearing she experienced.  Doe Dep. Tr. 43:16–17.  She had a chance to pack them but "let it go," and she knew before leaving that the items could be discarded because "[e]verybody around told us."  *Id.* 45:8–46:9.  That Doe and Adams have yet to lose unattended property under the clearing practices in the 2019 Protocol "substantially undermines their standing theory."  *Clapper*, 568 U.S. at 411.

---

[13]  Plaintiffs rely on testimony from Adams in which she described two times that she lost items during a clearing.  Sealed Adams Dep. Tr. 58–59.  But both incidents occurred in 2014 or 2015, before the 2016 and 2019 Protocols at issue.  *Id.*

Perhaps recognizing their uphill battle, Plaintiffs argue that destroying their property "is catastrophic, lessening the burden on [them] to demonstrate 'imminence.'"  Pls.' Mot. at 33. Plaintiffs claim that the "more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing." *Id.* (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996)).  In *Mountain States*, the Circuit considered when probabilistic injuries in the environmental context suffice to establish imminent injury under an "increased risk of harm" standing theory.  92 F.3d at 1235 (finding incremental risk in wildfire "enough of a threat of injury to entitle plaintiffs to be heard").

The Court does not doubt the personal value of Plaintiffs' property.  But that is not enough.  Even if Plaintiffs do pursue increased-risk-of-harm standing here (which is not apparent), they still must show "at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (Kavanaugh, J.) (emphasis in original).  And courts still must be "mindful . . . that the constitutional requirement of imminence as articulated by the Supreme Court . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Id.* at 1296.  The task remains to decide whether "the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* at 1298.

So the "strict understanding" of what constitutes "substantial" compels the same conclusion here.  The evidence does not show that Plaintiffs face a "substantial probability of harm" given all that must happen before they suffer property loss under the District's clearing practices.  As explained, the only two Plaintiffs still subject to potential clearings have yet to

experience the harm they fear.  It seems unlikely they ever will.  This route thus does not help Plaintiffs establish standing.

In sum, Plaintiffs have failed to show that their asserted injury is "imminent," *Lujan*, 504 U.S. at 560, or "certainly impending," *Clapper*, 568 U.S. at 409.  They therefore cannot show an injury in fact.

**b.**

Plaintiffs raise an alternative argument too.  They contend that "because [they] seek to vindicate procedural rights under both the Fourth and Fifth Amendments, they need not demonstrate imminent injury or redressability."  Pls.' Mot. at 35.

But Plaintiffs offer little more.  They do not elaborate on these "procedural rights."  Or how they establish standing here.  Plaintiffs instead claim that they have procedural standing "given the procedural nature of the constitutional rights they assert."  *Id.* at 34.  Plaintiffs must do more than just raise a Fourth or Fifth Amendment claim to establish procedural standing. *Accord Common Cause v. Biden*, 909 F. Supp. 2d 9, 19 (D.D.C. 2012) ("[N]ot all procedural-rights violations are sufficient for standing[.]"), *aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014).  They fail to meet their burden here.  *Clapper*, 568 U.S. at 411–12 ("The party invoking federal jurisdiction bears the burden of establishing standing[.]" (cleaned up)).

Even if the Court considered their procedural standing theory, it would fail.  To establish procedural standing, Plaintiffs still must show not only that "the defendant's acts omitted some procedural requirement, but also that it is *substantially probable* that the procedural breach will cause the essential injury to the plaintiff's own interest."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (emphasis added) (quoting *Fla. Audubon Soc'y v. Bensten*, 94 F.3d 658, 664–65 (D.C. Cir. 1996) (en banc)).  There must be "injury beyond mere

21

procedural misstep per se to satisfy standing in a procedural-rights case." *Id.* at 1160.  The "chain of causation between the procedural violation and the concrete interest may not be merely speculative." *VioPharma, Inc. v. Hamburg*, 777 F. Supp. 2d 140, 145 (D.D.C. 2011) (cleaned up).

In *Center for Law and Education*, for example, the Circuit held that plaintiffs challenging the composition of a rulemaking committee did not have procedural standing.  396 F.3d at 1157–60.  The court reasoned that the "chain of causation between the alleged procedural violation and the concrete interest is speculative at best." *Id.* at 1159.  Plaintiffs thus failed to "demonstrate the necessary causal connection between the challenged agency action— here, the promulgation of final rules—and the alleged injury." *Id.* at 1160.  The challenged agency action and plaintiffs' alleged injury stood at "opposite ends of a long chain." *Id.* at 1160–61.

Plaintiffs appear to ask the Court to scrap two of the three elements of the "irreducible" constitutional minimum of standing. *Lujan*, 504 U.S. at 560.  To be sure, procedural standing may "loosen[] the strictures of the standing inquiry, by relaxing the immediacy and redressability requirements." *In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 976–77 (D.C. Cir. 2013) (cleaned up).  But it "does not—and cannot— eliminate any of the irreducible elements of standing." *Fla. Audubon Soc'y*, 94 F.3d at 664 (cleaned up).

With little to go on, the Court assumes that the District's "procedural breach" is insufficient notice about the "consequences of a clearing."  Pls.' Reply at 31.  But Plaintiffs still have not shown that "it is *substantially probable* that the procedural breach will cause the essential injury to the plaintiff's own interest." *Ctr. for Law & Educ.*, 396 F.3d at 1159

(emphasis in original).  Recall that Plaintiffs "fear that [the District's] homeless encampment clearing practices will result in the destruction of their property" because they "cannot be with [their] belongings at all times."  Third Am. Compl. ¶¶ 100–01; *see also* Adams Discovery Resps. at 3; Doe Discovery Resps. at 3; Braxton Decl. ¶ 25.  But the facts remain that Plaintiffs have 14 days to move their belongings before the clearing, and the only two Plaintiffs currently experiencing encampment clearings have typically moved their belongings the day before a clearing anyways.  *See* Ex. 15 Adams Dep. Tr. 154:6–18; Doe Dep. Tr. 43:2–12; *id.* 43:22–44:8.  So even if the District should provide *more* information in its notice about the "consequences of a clearing," Plaintiffs' feared loss of property still stands at "opposite ends of a long chain" from this procedural breach.  *Ctr. for Law & Educ.*, 396 F.3d at 1160.

Plaintiffs cannot establish standing through any procedural right.

*        *        *

In sum, none of the Plaintiffs has standing to seek declaratory and injunctive relief against the District's current clearing practices.  The Court will therefore grant summary judgment for the District on Count III.  The Court will also deny Plaintiffs' renewed class certification motion as moot.[14]  *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

---

[14]  Plaintiffs only seek to certify a class for prospective relief, not damages.  *See* Pls.' Reply in Supp. Renewed Mot. Class Certification at 16 n.8, ECF No. 121 ("The District is correct in noting that Plaintiffs have declined to seek certification of a damages class, and Plaintiffs do not intend to do so.").

**2.**

All that remains is Braxton's as-applied claims under the Fourth and Fifth Amendments for past harm (Counts I and II).  The others do not pursue this relief.  *See* Def.'s SUMF ¶ 47 ("Ms. Adams does not seek damages for alleged property loss in this lawsuit."); *id.* ¶ 83 ("Ms. Doe does not seek damages for alleged property loss in this lawsuit.").  The District does not contest Braxton's standing to raise her as-applied challenge.  But the Court is "obliged to consider the issue *sua sponte*."  *Catholic Serv. v. Shalala*, 12 F.3d 1123, 1125 n.2 (D.C. Cir. 1994).

The Court is satisfied that Braxton can proceed.  She offers evidence of alleged property loss from a District clearing in May 2017, including a specific description of the items she claims went missing.  *See* Braxton Decl. ¶ 21; Ex. 16 Braxton Dep. Tr. 109–10.  Braxton thus can raise "a claim for damages against the [District] that appears to meet all Article III requirements," even if she cannot pursue prospective relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

**B.**

Whether Braxton's as-applied claims under the Fourth and Fifth Amendments survive summary judgment is a separate question.  *See* Def.'s Mem. at 40–51.

Section 1983 allows Braxton to sue the District for constitutional violations.  But "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978).  The Court thus conducts a two-step inquiry.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (2003).  First, there must be a predicate constitutional violation.  *Id.*  Second, a District custom or policy must serve as the "affirmative

link" to that constitutional violation, "such that [it] was the moving force behind the constitutional violation." *Id.* (cleaned up).

The Circuit has articulated a "number of ways" a municipal policy can establish § 1983 liability:  "the explicit setting of a policy by the government that violates the Constitution"; "the action of a policy maker within the government"; "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'"; "or the failure of the government to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Id.*

## 1.

The Court first considers whether Braxton has shown a predicate constitutional violation.  She asserts that the District destroyed her wanted, unattended property during a May 2017 clearing in violation of the Fourth Amendment.  Pls.' Reply at 23.

The Fourth Amendment secures the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property."  *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (cleaned up).  And "[d]estroying property meaningfully interferes with an individual's possessory interest in that property."  *Proctor I*, 310 F. Supp. 3d at 114 (cleaned up).

The seizure also must be unreasonable to violate the Fourth Amendment.  "To assess the reasonableness of a seizure, "[the Court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental

interests alleged to justify the intrusion." *Johnson v. District of Columbia*, 528 F.3d 969, 974

(D.C. Cir. 2008) (cleaned up).

The Fourth Amendment does not prohibit seizure of property that has been

"abandoned." *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989). The abandonment

inquiry depends on the intent of the person alleged to have abandoned the property. *Id.* at 846.

It is an objective test, and courts may infer intent from "words spoken, acts done, and other

objective facts." *Id.*

The undisputed record shows that the District did not destroy Braxton's property during

the May 2017 clearing. District personnel informed "Braxton that all her belongings, except for

food items, would be subject to be taken to [Adams] Place." Def.'s SUMF ¶ 65 (cleaned up).

After the clearing, someone at Adams Place confirmed to Braxton that *all* her items were in fact

stored:

> I called directly to Adam's Place and whoever was answering their phone at the
> time told me that they had -- they got my name. They had my name on my things.
> I told them I had a tent. I told them I had plastic bins with clothing, plastic bins
> with food. I had water. I had jewelry. I had electronics. I had cleaning things. I
> had suitcases. I had all that stuff. And they said they had it all, every single thing.

Ex. 16 Braxton Dep. Tr. 109:7–16; *see also* Def.'s SUMF ¶ 68. As Braxton admits, "[t]hey

didn't say they destroyed anything." Ex. 16 Braxton Dep. Tr. 109:17–20. The District thus

complied with the Fourth Amendment by storing Braxton's property. *See Lavan v. City of Los

Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012) ("the seizure of the property would have been

deemed reasonable had the City held it for return to its owner instead of immediately destroying

it").

Upon learning that Adam's Place had her items, however, Braxton did not retrieve them.

Rather, she waited several weeks to visit the storage facility. Def.'s SUMF ¶ 69. By that time,

Braxton claims that "she was only able to recover a few of her items." *Id.* ¶ 70. The only reasonable inference from this evidence is that her items were destroyed, mislaid, or taken by someone else *while in storage*, not destroyed during the clearing. Braxton does not challenge the District's storage policies under the Fourth Amendment. So it would be inappropriate for the Court to assess whether the District's storage policies and actions here violated her constitutional rights. Indeed, Braxton wants *more* storage options from the District, not less. *See* Pls.' Reply at 36 ("Given these inadequate notice and outreach procedures, the District could lower the risk of erroneous deprivation by storing more property.").

Even if the District did destroy Braxton's property during the clearing, Plaintiffs offer little evidence to show that the destruction was unreasonable. Braxton refers to the "sound condition of her belongings." *Id.* at 23. But the evidence is lacking.[15] Her declaration states only that the food in her tent "was in good condition and not rotten." Braxton Decl. ¶ 15. Even so, food was not eligible for storage then (and still is not). Pls.' Mot. Ex. 1 at 9; *id.* Ex 2 at 7. Braxton does not describe elsewhere in her declaration the conditions of the other items she sought to reclaim at Adams Place. So the Court has no basis to conclude that items such as Braxton's mattress or clothing were otherwise eligible for storage in the first place—that they were not hazardous, wet or soiled, infested or potentially infested with bugs. Hr'g Tr. 12:4–13, ECF No. 130 (Plaintiffs' counsel agreeing that "District would have a legitimate health and safety concern in removing sharps, soiled clothing, buckets of urine . . ."); *see also Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 986 (N.D. Cal. 2019) ("[T]he City has a legitimate interest in . . . removing unsafe or hazardous conditions from its public spaces."); *Lavan v. City*

---

[15] Braxton offers evidence of the market value for her lost items. *See* Sealed Expert Report of Archan H. Ruparel, ECF No. 107. But this market value does not establish the condition of the lost items.

*of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) ("The City will still be able to . . . remove hazardous debris and other trash.").

As Braxton admits, "[s]ome of [her] most important belongings were not in plain sight." Braxton Decl. ¶ 5.  Under current policy, District personnel need not "sort through piles or collections of belongings, including items inside tents or containers" to identify eligible property to store.  Pls.' Mot. Ex. 1 at 9.[16]  This limitation is "[d]ue to safety and other concerns."  *Id.*  Obvious safety issues could include secreted sharps, biohazards, and weapons. Rummaging through unattended items could also presumably raise privacy concerns.  So there are both private and governmental interests that make this proviso eminently reasonable under the Fourth Amendment.  *See Johnson*, 528 F.3d at 974.

There is no predicate Fourth Amendment violation to establish District liability under § 1983.

### 2.

The Court turns next to whether Braxton can prove a predicate violation of her Fifth Amendment rights under Count II.  She claims that the District violated her procedural due process rights because the District's written notice signs are "not reasonably calculated to inform encampment residents about the likely destruction of their unattended property or provide them the information necessary to protect their property."  Pls.' Reply at 30–31.  Not so.

"The Fifth Amendment's Due Process Clause prohibits the District of Columbia from depriving persons of 'property without due process of law.'"  *Wash. Legal Clinic for the*

---

[16]  The 2019 Protocol reflects the District's actual encampment clearing practices.  Pls.' SUMF ¶ 15.  So the Court refers to it here when discussing the clearing practices in May 2017.

*Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) (quoting U.S. Const. amend. V).  "[D]ue process requires the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (cleaned up).  The Court must weigh "the risk of an erroneous deprivation" against any "additional or substitute procedural safeguards."  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Recall that only Braxton claims property loss under the District's clearing practices. The undisputed record shows that the District did not violate Braxton's Fifth Amendment rights during the May 2017 clearing.  "District personnel informed [Braxton] that the District would be conducting a clearing the next day."  Def.'s SUMF ¶ 63; *see also* Ex. 16 Braxton Dep. Tr. 93:7–94:2.  Those same personnel also told Braxton "that she would have to move her belongings off M Street for the cleaning."  Def.'s SUMF ¶ 63.  And Braxton told them that she wanted her items stored, which she invoked and which they agreed to do.  *Id.* ¶¶ 64–65.  It is undisputed then that Braxton received *actual* notice of the clearing and that her belongings must be moved beforehand—more than the Fifth Amendment requires.  *See Small v. United States*, 136 F.3d 1334, 1336 (D.C. Cir. 1998) ("[T]he Due Process Clause does not demand actual, successful notice[.]").  So the District did not violate Braxton's procedural due process rights. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) ("*actual* notice of the filing and contents of [debtor's] plan . . .  more than satisfied [petitioner's] due process rights" under the Fifth Amendment).

More, the District announced the clearing with a sign.  *See* Horen Decl. ¶ 61; *id.* Ex. 7, ECF No. 18-7.[17]  The sign included the date and time of the clearing and stated that "[p]ersonal belongings, in plain sight, considered to be of obvious value" "will be temporarily placed in storage."  *Id.* Ex. 7.  It also cautioned that "[a]ll other items visible from this location and not removed from this public space by the above stated scheduled cleanup time are subject to removal and disposal."[18]  *Id.*

And at the time of the May 2017 clearing, Braxton already knew about "the Adams Place storage facility from the posted sign and previous written letters [she] had received."  Braxton Decl. ¶ 11.  Adams Place confirmed for Braxton after the clearing that *all* her items were stored there, consistent with the notice.  Def.'s SUMF ¶ 68; *see also* Ex. 16 Braxton Dep. Tr. 109:7–16 ("They had my name on my things.  I told them I had a tent.  I told them I had plastic bins with clothing, plastic bins with food.  I had water.  I had jewelry.  I had electronics.  I had cleaning things.  I had suitcases.  I had all that stuff.  And they said they had it all, every single thing.").[19]

---

[17]  The clearing was originally scheduled for May 11, but the District rescheduled it for a week later and updated the notice "at least 48 hours prior to the cleanup."  Horen Decl. ¶ 61.

[18]  Braxton suggests in her declaration that "the posted sign did not indicate any clearing scheduled for the following day."  Braxton Decl. ¶ 12.  It is unclear whether Braxton is referring to a different sign or the one the District submitted photographic evidence of, which shows a May 18, 2017 clearing date.  If she is referring to the sign depicted in the photo, the "photographic evidence belies [her] claims" that the sign did not have the correct date and time. *Thorp v. District of Columbia*, 319 F. Supp. 3d 1, 15–16 (D.D.C. 2018), *aff'd*, 788 F. App'x 8 (D.C. Cir. 2019).  It is thus appropriate to rely on the photographic evidence at summary judgment, not Braxton's declaration. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[19]  There is a reasonable inference that some of Braxton's items were destroyed or mislaid between the time when Braxton called Adams Place and when she went to retrieve them weeks later.  But Plaintiffs' Fifth Amendment claim does not challenge the adequacy of the District's

On this record, the District "more than satisfied [Braxton's] due process rights." *United Student Aid Funds, Inc.*, 559 U.S. at 272.  Plaintiffs therefore cannot establish a predicate violation of the Fifth Amendment.

### 3.

Even if Braxton had shown a predicate constitutional violation, she fails to identify a District custom, policy, or practice that acted as the "affirmative link" to any destruction of her property during the May 2017 clearing.  *Baker*, 326 F.3d at 1306.  Tellingly, Braxton does not rely on examples of homeless individuals who lost wanted, unattended property during District clearings to establish the District's liability here.  She instead cites "a consistent pattern of conduct evidenced in policy documents, statements by District officials, and the District's own clearing records."  Pls.' Reply at 47.

The strongest evidence are two documents stating that "[i]f an owner cannot be identified, items are determined abandoned and disposed of."  *See* Pls.' Reply Ex. 28 at 2, ECF No. 136-31; *id.* Ex. 37 at 14, ECF No. 136-40.  Braxton characterizes them as "[i]nternal guidance documents pertaining to encampment clearings."  Pls.' Reply at 47.  But it is unclear how these documents can be considered "internal guidance."  The first document is "Appendix C: Encampment Talking Points."  *Id.* Ex. 28 at 1.  As the District points out, there is no author or date provided for this document, and Plaintiffs offer no further explanation for how the District used it, if at all.  The second document is a 2017 presentation called "Homeless Encampments."  *Id.* Ex. 37 at 2.  Braxton suggests that this document is a "Homeless

---

procedures for post-clearing storage.  It focuses on lack of notice *before* any clearing, which explains why Plaintiffs seek *more* storage.  *See* Pls.' Reply at 36 ("Given these inadequate notice and outreach procedures, the District could lower the risk of erroneous deprivation by storing more property.").

Encampment Training." Pls.' Reply at 47 n.20. No evidence shows that this was a "training." This presentation went to "non-District-employees through the District's Department of Small and Local Business Development." Def.'s Reply in Supp. Cross-Mot. Summ. J. at 12, ECF No. 140 (citing Ex. 16, ECF No. 114-16). Even drawing all reasonable inferences in her favor, without more, the Court cannot find that either document qualifies as a "policy document" sufficient to impose liability on the District. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Braxton also identifies a "memorandum issued by the official overseeing encampment engagements," which notes that "unattended belongings need to be consistently discarded in order for consumers to take the protocol seriously." Pls.' Reply at 47 (cleaned up). There is no evidence, however, that the District ever issued or implemented this memorandum. Indeed, its file name suggests that it was "never sent." *See* Def.'s Reply in Supp. Mot. Dismiss & Mot. Summ. J. Ex. F at 2, ECF No. 114-7.

Plaintiffs thus fail to "produce evidence sufficient to support a finding" that these documents reflect a District policy to establish § 1983 liability. *See* Fed. R. Evid. 901(a).

Braxton next offers statements from "District policy officials," including former Encampment Coordinator Elizabeth Horen and Deputy Chief of Staff and Acting Encampment Coordinator Jessica Smith. Pls.' Reply at 47–48. She does not elaborate more on how either is a "*final* policymaker" who can trigger municipal liability. *See Thompson v. District of Columbia*, 832 F.3d 339, 348 (D.C. Cir. 2016) (emphasis in original). She does not show, for example, that either "speak[s] with final policymaking authority" for encampment clearings.

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  And neither is "an agency head or the governing body of an agency."  *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) ("[C]ourts in this district have held that a final policy maker typically must be at least an agency head or the governing body of an agency." (cleaned up)).

Horen, for example, was a Program Analyst in the Office of the Deputy Mayor for Health and Human Services "responsible for scheduling and coordinating cleanups."  Horen Decl. ¶¶ 1–2.  Perhaps she had discretion to implement the 2016 Protocol.  But that is not enough to establish final policymaking authority.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").

In any event, Horen's isolated statements are not dispositive.  Horen states that "[i]tems . . . are deemed abandoned when the owners leave after the cleanup team is already on site, indicating that he or she is abandoning the property."  Horen Decl. ¶ 52.  At most, this comment supports a District practice to consider property abandoned if an owner leaves *after* the clearing has begun.

The Court doubts that this creates municipal liability under the Fourth Amendment in the first place.  *See Proctor I*, 310 F. Supp. 3d at 115 (agreeing that the "District could reasonably conclude Plaintiffs had abandoned their property" because "Braxton walked away from it at the beginning of a cleanup, despite having more than two-weeks' notice that the cleanup would take place").  And elsewhere Horen describes a "consultation process to determine whether property has been abandoned," which includes input from District "outreach workers, third-party outreach providers, and other individuals with tents or other property at the

location." Horen Decl. ¶ 47. These statements reflect a deliberative process, not—as Plaintiffs

suggest—a custom to uniformly destroy unattended belongings.

Smith stated that "[i]f property is left within the cleanup zone after the time of a posted

cleanup, it is subject to disposal, and I am assuming that it is abandoned property." Pls.' Reply

Ex. 8, Dep. Tr. of Jessica Smith 26:16–27:4, ECF No. 136-11. But she elaborated on all that

must happen before the District determines property like a "functional tent" is abandoned:

> Yeah. Hypothetically, if there was a functional tent left within the cleanup zone
> after the time of the cleanup which has been properly noticed, 14 days, *and* no one
> is there to claim the tent *and* I have talked with outreach workers about the notice
> that they have provided *and* I have talked with other residents about if they
> know . . . whose this tent is *and* it is still there and no one has moved it, yes, it
> would be abandoned.

*Id.* 27:14–22 (emphasis added); *see also id.* 29:16–23 ("[She] would have talked to an outreach

worker. [She] would have talked to other residents there, and [she] would assume that if it was

left in that area, that they did not want it. Therefore, they must not have thought that it was of

obvious value."). Smith also stated that the District would store electronics and identification

cards, even if they were considered abandoned. *See id.* 28:5–11. On the whole then, Smith's

testimony does not support a blanket policy to destroy all unattended property during a clearing.

Finally, Braxton points to the District's clearing records. She claims that the "records

support an inference that the District summarily disposed of some or all of encampment

residents' property in 82 of 102 cases involving unattended belongings (approximately 80%)."

Pls.' Reply at 48. She invites the Court to infer that the "disparity in destruction versus storage"

reflects a policy to discard all unattended belongings during clearings. *Id.* at 37.

The Court declines to rely on these statistics. They offer no insight into whether

unattended belongings were wanted and of a class of items that the District should have

stored—not soiled, hazardous, or bug-infested—but did not. *Accord Hooper v. City of Seattle*,

No. C17-0077RSM, 2017 WL 591112, at *11 (W.D. Wash. Feb. 14, 2017) (rejecting evidence

of "spreadsheet documenting cleanups" to "establish[] the existence of a widespread and

persistent pattern of the summary destruction of unhoused individuals' property" because

"[c]onsidering the number of reasons why property may not be stored—including that property

may have been abandoned—the Court is not convinced that citation to a statistic derived from a

two-month period demonstrates the City's widespread engagement in a pattern of summarily

destroying property"), *aff'd sub nom. Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019).

> Consider the following painstaking summary of an August cleanup:
>
> In total, three of the four tents were disposed of.  The burnt tent and all the destroyed items that were inside were thrown out, as well as another tent belonging to the woman (she no longer wanted it).  Another larger tent was also on site, but the owner was not.  OHS [Occupational Health and Safety] confirmed that they were unsuccessful in making contact with the owner over the two weeks the notification signs were posted and were unsure the owner was still around.  OM HHS [Health and Human Services] also asked the other individuals on location if they had seen the owner of the tent.  The individuals reported to OM HHS that they like to keep to themselves, and thus were unsure of who owned the tent and did not really keep track of when they saw the occupants (when asked if the last time they saw the owners of the other tent, they said it hadn't been too recent).  At this point, OM HHS made the determination that the tent was unclaimed and gave OPW [Public Works] the okay to dispose of it.  The fourth tent was disassembled by its owner and moved off site.

Pls.' Mot. Ex. 41 at 12.  Statistics in the context of this August cleanup would be misleading.

They would show that three tents were discarded.  But two were not even among the class of

items that *could* be stored—one was burnt and the other abandoned.  And District personnel

conducted a careful inquiry to determine whether the final tent was still wanted.  *Accord*

*Proctor I*, 310 F. Supp. 3d at 116 ("When District employees encounter unattended property,

they consider many factors and consult several sources, including other encampment residents,

to make what appears to be a good-faith determination about whether the property is

abandoned."). So the Court declines to rely on raw numbers as proof of the District's alleged policy of destroying unabandoned but unattended belongings.

Braxton also notes "that only 10% of clearings identified in the District's list of 2019 encampment clearings were designated as 'trash collection only,'" which she argues "supports an inference that in the other 90% of cases, the District discarded items that were not 'trash.'" Pls.' Reply at 48 (citing Ex. 39, ECF No. 136-42). The Court disagrees. The District may conduct a clearing for reasons other than collecting trash, including when an encampment "interferes with community use of public space" or "becomes a significant community nuisance." Pls.' Mot. Ex. 1 at 5; *id.* Ex. 2 at 4 (same). That does not mean trash removal does not occur during these other clearings. For instance, the District did not designate a July 2019 clearing as "trash collection only." *See* Pls.' Reply Ex. 39 at 2. But the report for that clearing reveals that "[t]he team removed all of [the] trash and debris from the site." Pls.' Mot. Ex. 41 at 226. It notes that "there were many biohazards on site such as urine in open containers and used needles in thin plastic bottles." *Id.* These naked statistics cannot establish a District custom or policy under § 1983.

The evidence is even less convincing to establish municipal liability under the Fifth Amendment. Recall, for example, the "Encampment Talking Points" Plaintiffs identified. *See* Pls.' Reply Ex. 28 at 2. Even if they do reflect a District "policy"—which Plaintiffs have not established—these "talking points" undermine the policy Braxton seeks to establish in pursuit of her Fifth Amendment claim. The talking points provide that the District will "post signs at least 14 days [in] advance . . . of an upcoming cleanup event." *Id.* They also state that "[o]utreach teams also conduct final outreach to locations at least 48 hours in advance of a cleanup event to remind individuals of the upcoming cleanup." *Id.*; *see also* Pls.' Reply Ex. 37

at 11 (noting signs posted "allowing at least 14 days advance notice of an upcoming cleanup event."). So the "policy" reflected, if any, is that the District notifies homeless individuals of a clearing using signs and outreach. This two-pronged approach is "reasonably calculated" to provide notice under the Fifth Amendment. *Accord Love v. City of Chicago*, No. 96 C 0396, 1998 WL 60804, at *11 (N.D. Ill. Feb. 6, 1998) (finding written and oral notice "reasonably calculated" to notify homeless individuals of clearing).

Plaintiffs also contend that "[t]here is a genuine factual dispute over whether the District has consistently failed to inform encampment residents of a clearing and its consequences before destroying their un-abandoned property." Pls.' Reply at 27–28. The Court disagrees.

Plaintiffs do not dispute that the District had to "post notices of cleanings 14 days prior to the cleaning to afford individuals affected by the cleaning time to voluntarily remove their property." Pls.' Resp. Def.'s SUMF ¶ 7, ECF No. 136-1. And that District outreach staff had to "reach[] out to encampment occupants to let them know the cleaning would occur." *Id.* ¶ 13.

To start, the two-week notice is more extensive than other cities' policies that survived similar constitutional challenges. *See, e.g.*, *Sullivan*, 383 F. Supp. 3d at 982 (rejecting argument at summary judgment that the Constitution required city to "disclose the precise date and time at which it will return to enforce the encampment's removal" after "provid[ing] 72-hours' notice that a removal action is imminent"); *Hooper*, 2017 WL 591112, at *5, *7 (finding plaintiffs failed to show success on the merits where notice of clearing posted "at least 72 hours in advance"); *De-Occupy Honolulu v. City & Cnty. of Honolulu*, No. 12-cv-00668 JMS, 2013 WL 2285100, at *6 (D. Haw. May 21, 2013) (same for 24-hours' notice); *Love v. City of Chicago*, No. 96 C 0396, 1996 WL 627614, at *4 (N.D. Ill. Oct. 25, 1996) (rejecting contention that

additional procedures were needed where city provided 12-hour notice and "[t]he 48-hour advance notice . . . would not be much more valuable").

Still, Braxton proffers reasons why the District's notice might not work.  For example, Braxton claims that the notice "contains vague and ambiguous language that leads to confusion and inconsistent implementation"; that "encampment residents may still struggle to comprehend the notice due to illiteracy, or mental illness"; that "encampment residents who do not speak English or who speak English only as a second language may have an especially difficult time comprehending the English-only signage"; and that "signs are typically posted out of ordinary view and may blend in with other signs." Pls.' Reply at 32 (cleaned up).  She also contends that the District's outreach efforts do not reach every resident.  *Id.* at 34.

But recall that the District's notice need only be "reasonably calculated." *Jones*, 547 U.S. at 226.  Plaintiffs themselves show that the District's notice practices pass muster under this standard.  They confirmed that the District had a consistent practice of notifying individuals of clearings.  Adams explained that "normally" the District conducts a clearing "two weeks from th[e] day that they put the sign up."[20] Ex. 15 Adams Dep. Tr. 57:14–58:6.  Braxton also noted that she "usually" saw a notice sign every month prompting her to "note the cleanup date and make sure that [she] had [her] stuff moved." Ex. 16 Braxton Dep. Tr. 98:5–18.  She also explained that "city workers taught us . . . they came and taught us how to move the things." *Id.* 99:9–13.  Braxton knew about "the Adams Place storage facility from the posted sign and

---

[20]  Plaintiffs point to other testimony from Adams in which she testified that the District is "supposed to give us two-week notice, but they don't have to" if someone complains about the encampment.  Ex. 15 Adams Dep. Tr. 76:19–22.  But she conceded that the District has yet to conduct a clearing without notice based on complaints. *Id.* 77:20–22.

previous written letters [she] had received." Braxton Decl. ¶ 11. And Doe similarly testified

that workers update notice signs to reflect clearing times. Doe Dep. Tr. 39:21–40:1.

Each Plaintiff also understands that she must remove property before the clearing.

Having experienced "at least 15 cleanings," Pls.' SUMF ¶ 40, Doe stated that "nothing should

be on site" when District personnel arrive to clean, Doe Dep. Tr. 169:1–3. Adams has

participated in around 20 encampment clearings. Def.'s SUMF ¶ 39; Pls.' SUMF ¶ 36. She

"[k]eep[s] track of the dates when they're doing clean-ups" to be prepared, Ex. 15 Adams Dep.

Tr. 60:10–22, and knows that "[e]verything has to be moved from the location at 10:00 a.m.,"

Def.'s SUMF ¶ 42 (cleaned up). Braxton "note[d] the cleanup date and ma[d]e sure that [she]

had [her] stuff moved." Ex. 16 Braxton Dep. Tr. 98:8–18. Braxton explained that "city

workers . . . came and taught us how to move the things." *Id.* 99:9–13.

Plaintiffs also try to show that the District has conducted clearings without sufficient

notice before. But their efforts fall short.

Plaintiffs submit evidence that the District "may have" posted signs listing the wrong

date, Pls.' Reply Ex. 9, Dep. Tr. of Kangeun Kelly Jeong-Olson 193:2–4, ECF No. 136-12, or

that "[s]ometimes the clearing notices have not been accurate," *id.* Ex. 2, Dep. Tr. of Judy

Williams ("Williams Dep. Tr.") 39:20–22, ECF No. 136-5. But there is little evidence that

clearings took place under these deficient notices. If anything, the record shows the opposite—

that when notices were deficient, the District cancelled cleanups. In one instance of improper

notice, for example, the report states that "CLEAN UP CANCELLED DUE TO SIGNS NOT

BEING POSTED IN CORRECT LOCATIONS." Pls.' Mot. Ex. 29 at 3, ECF No. 126-32; *see*

*also id.* Ex. 27, ECF No. 126-30 (no indication that clearing went forward); *id.* Ex. 28 at 2, ECF

No. 126-31 (stating that "[t]his camp has not been properly posted" and "[p]lease review and

advise of next steps"); Williams Dep. Tr. 40:5–20 (D.C. Homeless Service Coordinator testifying that she was unaware of clearings that occurred under erroneous notices).

One clearing apparently happened when the sign contained the incorrect date. *See* Pls.' Mot. Ex. 30, ECF No. 126-33. But the evidence also shows that "numerous engagements with the individuals from this location" occurred in the days before the clearing and that "they were all aware that the cleanup was scheduled." *Id.* District personnel arrived an hour before this clearing "to once again inform the residents about what was going to occur and what courses of action were available to them." *Id.* Even with the defective sign then, the District did provide notice "reasonably calculated" to homeless individuals about this clearing. *Accord Sullivan*, 383 F. Supp. 3d at 984 (finding no triable issue on due process claim where "encampment did, in fact, receive notice and a reasonable opportunity to pack up their belongings before the City collected any remaining unattended property"). And even if they did not, "[o]ne instance, however, egregious, does not a pattern or practice make."[21]  *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987).

*     *     *

In sum, after three years of litigation, not one Plaintiff has experienced a surprise encampment clearing or the destruction of unabandoned property during a clearing. They thus fail to show a predicate violation of their Fourth or Fifth Amendment rights to support a § 1983 claim against the District. Even if they did, the record does not establish any District custom,

---

[21]  Similarly, Plaintiffs suggest that the District has conducted re-clearings without notice. *See* Pls.' Reply Ex. 9, Dep. Tr. of Kangeun Kelly Jeong-Olson 196:12–24 (stating that "District has authority to perform recleaning"). The Court does not construe the Plaintiffs' filings as challenging the District's re-clearing practices. But in any event, evidence that the District "has authority to perform recleaning" without notice is insufficient to establish municipal liability. It does not show that the District does in fact consistently conduct re-cleanings without sufficient notice.

40

policy, or practice that served as the "affirmative link."  The District thus is entitled to summary judgment on Counts I and II.

## IV.

The Court recognizes that Plaintiffs have an interest in protecting their unabandoned property at these encampments, which may represent their only possessions.  But the District has an equally salient interest in ensuring the health, safety, and well-being of all City residents, including the homeless.  On its face, the 2019 Protocol contrasts with other cities' policies that did not survive constitutional scrutiny.

For example, the Ninth Circuit struck down a Los Angeles policy that provided only a general notice that cleanups could happen anywhere in Skid Row between 8 and 11 a.m. on any week day, which prevented homeless residents from anticipating when or where the cleanup would take place.  *See Lavan*, 693 F.3d at 1034 (Callahan, J., dissenting).  Los Angeles also admitted that it had "a policy and practice of seizing and destroying homeless persons' unabandoned possessions."  *Id.* at 1025.

A court recently invalidated Denver's policy, which provided morning-of notice of clearings, because the plaintiffs "had little time to collect and remove their belongings prior to the commencement of the sweeps."  *Denver Homeless Out Loud v. Denver*, --- F. Supp. 3d ---, 2021 WL 243450, at *7 (D. Colo. Jan. 25, 2021).  The court noted that "[i]f Denver provided homeless individuals with additional advance notice of sweeps, it would allow Plaintiffs a better chance to protect the property critical to their survival."  *Id.* at *8.

And in *Kincaid v. City of Fresno*—a favorite case for Plaintiffs—the court found unconstitutional a city policy to "immediately destroy[] all of the property that it seizes in its sweeps."  No. 106CV-1445 OWW SMS, 2006 WL 3542732, at *36 (E.D. Cal. Dec. 8, 2006).

There, Fresno made "no effort to separate and store for later retrieval items that are clearly owned and are valuable, not trash." *Id.* The city also "offered limited evidence of any pre-deprivation notice" and only "some evidence of oral notice before some of the City's sweeps." *Id.* at *38.

By contrast, consider the 2019 Protocol's terms. It requires 14-days' notice before a standard clearing, with "notices/signs conspicuously throughout the immediate vicinity of the public space to be cleaned." Pls.' Mot. Ex. 1 at 6. The notice warns that "property left on site during the cleanup may be immediately destroyed," but that "some unattended, non-hazardous property may be stored, in the District's discretion." *Id.* More, outreach workers must "make every effort to share this information verbally with anyone at the site and with community partners to ensure those who are unable to read or have difficulty comprehending the information are made aware of the impending cleanup action." *Id.* They also must "make clear to individuals experiencing homelessness that the only way to be sure property is not disposed of during a cleanup is to move the property from the cleanup site before the specified cleanup time." *Id.* at 7.

The District allows homeless individuals to store their belongings before a clearing begins. *Id.* at 8–9. And District personnel "make reasonable efforts to collect and store" eligible items that are "in plain sight, even if they are unattended at the time." *Id.* at 9. They even provide complimentary transportation to the storage facility. *Id.* at 8.

After three years of litigation, it is time to put this case to rest. The record shows that none of the Plaintiffs has standing to raise a facial challenge to the District's practices under the Fourth or Fifth Amendment. And the undisputed record shows that the only Plaintiff to have lost her wanted, unattended property during a clearing (once), did not suffer a constitutional

42

violation.  Even if she had, the evidence does not support a custom, policy, or practice to impose liability on the District for that violation.  The Court thus finds that the District is entitled to summary judgment on Plaintiffs' constitutional challenges to its clearing practices.

Plaintiffs' motion for summary judgment will be denied and Defendant's cross-motion for summary judgment will be granted.  A separate Order will issue.


Dated: March 31, 2021                                 _____
                                                      TREVOR N. McFADDEN, U.S.D.J.